UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

DEE ARLISE CHILDROUS,
    Plaintiff,

vs.                                                                                   07-1047

MEDICAL TECHNICIAN BIRKEL, et al.
    Defendants.

<u>SUMMARY JUDGEMENT ORDER</u>

    This cause is before the court for consideration of the pending motions for summary judgement. [d/e 42, 43, 46, 52].

## I. BACKGROUND

    The plaintiff, a state prisoner filed his initial complaint pursuant to 42 U.S.C. against three defendants at the Pontiac Correctional Center including Medical Technician John Birkel, Officer Cletus Shaw and Medical Director Dr. George Kurian.   The plaintiff then filed an amended complaint providing more details about his claims.  On April 30, 2007, the court conducted a merit review of the amended complaint and found that the plaintiff had adequately alleged that the defendants were deliberately indifferent to his serious medical condition when they denied or delayed treatment for an asthma condition and an asthma attack.  The claim is against the defendants in their individual capacities only.

## II. FACTS

    The following facts are based on the motions for summary judgement and the attached exhibits.

    Defendant Cletus Shaw is employed as a Correctional Lieutenant at Pontiac Correctional Center.  Defendant John Birkel is employed as a Medical Technician at Pontiac Correctional Center.

    Dr. Kurian is a doctor who was employed at the Pontiac Correctional Center from August of 2001 to July 5, 2006.  The plaintiff was one of the doctor's patients while he worked at the correctional center.

    The plaintiff suffers from chronic asthma and says he has suffered with this condition throughout his life. (Def. Memo, Plain. Depo, p. 70)

    On December 1, 1005, Dr. Kurian prescribed a QVAR inhaler and an Albuterol inhaler to

1

the plaintiff for his asthma.   The doctor says a QVAR inhaler is "a corticosteroid used to help prevent asthma attacks.  QVAR aerosol will not stop an asthma attack one has started, however Mr. Childrous was to inhale on a puff of QVAR by mouth twice daily for five months." (Def. Memo, Kurian Aff., p. 2).   The doctor says asthma medication like Albuterol will help stop an asthma attack after it has started.  Albuterol helps:

> reduce underlying inflammation of the airways and relieve or prevent systematic airway narrowing.  Control of inflamation should lead to reduction in airway sensitivity and help prevent airway obstruction.  Generally, these treatments are effective in reducing the spasms, opening the airways and giving the plaintiff relief without any further treatment. (Def. Memo, Kurian Aff., p.  1-2).

On February 8, 2006, the plaintiff says he believes he suffered an asthma attack beginning at about noon. (Def. Memo, Plain. Depo, p. 43).  In his deposition, the plaintiff was asked to rate the severity of this attack and he said it was around a "3 or 4." (Def. Memo, Plain. Depo, p 74). His condition worsened and when he arrived in the medical unit later in the afternoon, the plaintiff stated it was a "5 or 6." (Def. Memo, Plain. Depo, p. 72)  The plaintiff says he has experienced an asthma attack which he would rate a 10 during his lifetime. (Def. Memo, Plain. Depo, p. 72-73).

In his deposition, the plaintiff says he reported his condition to an officer and the officer told him he would contact Medical Technician Birkel.  The officer then returned and told the plaintiff that Birkel wanted the plaintiff to lie down and he would feel better. (Def. Memo, Plain. Depo, p. 43).  The plaintiff continued to ask for help and the officer contacted Lieutenant Shaw who reported to the plaintiff's cell.  The plaintiff told him of his condition. The plaintiff says Shaw told him that he also suffered from asthma and he did not believe the plaintiff was having an attack. Nonetheless, Shaw told the plaintiff he would also contact Birkel, but he could not control whether Birkel would come or not.   The plaintiff says this was the end of his contact with Shaw. (Def. Memo, Plain. Depo, p. 44).  The plaintiff also says he never saw or spoke with Birkel on February 8, 2006. (Def. Memo, Plain. Depo, p. 45).

The plaintiff says when the next shirt reported for work at about 3:00, another medical technician was called to his cell and the plaintiff was taken to the Urgent Care Clinic around 3:30. The plaintiff complained of feeling short of breath and coughing since the previous afternoon.  A registered nurse evaluated the plaintiff and then spoke with Dr. Kurian in the clinic. (Def. Memo, Kurian Aff., p. 2; Plain. Depo, p. 48).  The medical record shows the plaintiff's temperature and pulse were slightly above normal which Dr. Kurian says was consistent with his complaints.   Dr. Kurian says the plaintiff's vital signs "show that, although Mr. Childrous needed a breathing treatment for his acute asthma condition, he was in no immediate risk of serious harm." (Def. Memo, Kurian Aff., p. 2) The doctor ordered that the plaintiff be treated with "Albuterol using a special breathing machine known as a nebulizer." (Def. Memo, Kurian Aff., p. 3).   The doctor told the nurse to continue to monitor the plaintiff and inform him if his condition did not improve.

The medical records show the nurse used three different methods to access the plaintiff's condition after the nebulizer treatment.  First, the plaintiff's "oxygen saturation level was well within normal limits and, in fact, nearly perfect at 99%." (Def. Memo, Kurian Aff., p. 4).  Second, the plaintiff's peak flow was within a normal expected range.  Finally, the nurse listened to the plaintiff's lungs with a stethoscope and noted that his lungs were "clear in all fields." (Def. Memo, Kurian Aff., p. 4) Dr. Kurian says if the plaintiff was still experiencing problems, the nurse would have heard wheezing and other sounds in his lungs.

> In other words, the objective tests performed by the registered nurse on Mr. Childrous following the nebulizer treatment that I ordered demonstrate that he was suffering no respiratory distress and that the acute asthma had been relieved.  No further treatment was warranted at that time, and Mr. Childrous was able to return to urgent care if needed....(Def. Memo, Kurian Aff., p. 4)

The plaintiff says he returned to his cell, but about two hours later, his asthma began to flare up again.  The plaintiff says he told an officer about it, but was told there were no doctors in the Health Care Unit.  The plaintiff says he suffered with the problem throughout the night, but did use his inhaler. (Def. Memo, Plain. Depo, p. 49-50).  The plaintiff says he showed up for work the next day and told his supervisor about the problem.  The supervisor called Medical Technician Birkel and told the plaintiff to sit and wait.  The plaintiff claims that Birkel did not show for about 40 minutes. (Def. Memo, Plain. Depo, p. 52)  The plaintiff says Birkel offered little assistance, doubted his condition, and instead made a phone call.  Nonetheless, he did take the plaintiff to the Health Care Unit. (Def. Memo, Plain. Depo, p. 52-53).

A memorandum written in response to the plaintiff's grievance indicates that Birkel said in his medical opinion, the plaintiff was not suffering from an asthma attack on February 9, 2006.  He still spoke with a doctor who told Birkel to bring him to the Health Care Unit for an evaluation. (Plain. Mot, March 14, 2006 Memo)

Medical records show the plaintiff returned to the Urgent Care Unit on February 9, 2006 around 10:30 in the morning and told the nurse he had been "coughing and spitting up thick, white mucus." (Def. Memo, Kurian Aff., p. 4).  The nurse took the plaintiff's vital signs and noted that his oxygen saturation level was at 95% which was still within the normal limits.

The plaintiff was examined that morning by Dr. Larson.  The plaintiff stated that he had been suffering from coughs, aches and lack of energy for two days.  Dr. Larson reviewed the previous days examination and determined that the plaintiff was suffering from an upper respiratory infection which was exacerbating his chronic asthma.  Treatment was provided.

The plaintiff filed a grievance on February 21, 2006 concerning the treatment he received on February 8 and 9, 2006.  The plaintiff complained about the length of time it took Defendants Birkel and Shaw to take him to the Urgent Care Unit and the fact that Dr. Kurian did not personally

examine the plaintiff on February 8, 2008. On March 1, 2006, the grievance was forwarded to the medical unit for a response. The grievance officer then provided responses on both June 15, 2006 and May 5, 2007. (Def. Memo, Group Ex. #1)

On June 15, 2006, the officer recommended that the delay in bringing the plaintiff in for medical help should be referred to Internal Affairs for review and investigation. The Chief Administrative Officer concurred on June 23, 2006. On March 8, 2006, the grievance officer noted that Internal Affairs had completed its investigation and found that the offender's allegations were unsubstantiated. The officer recommended that the grievance be denied.
The Chief Administrative Officer concurred on May 10, 2007. (Def. Memo, Group Ex. #1)

The Chairperson of the Office of Inmate Issues, Brian Fairchild, says the plaintiff did not appeal either one of these responses. (Def. Memo, Fair. Aff, p. 2) However, the Administrative Review Board (herein ARB) did receive a grievance from the plaintiff on July 11, 2006. Fairchild says he responded to the grievance on April 9, 2007. The letter sent to the plaintiff states that Fairchild has reviewed the recommendation of June 23, 2006, and contacted Internal Affairs which provided a response to the ARB. Based on the results, the grievance was denied, but the Warden was advised to review the investigation results regarding any appropriate administrative action. (Def. Memo, Group Ex. #1). Fairchild says the plaintiff did not follow the correct procedures to exhaust his administrative remedies. (Def. Memo, Fair. Aff, p. 2).

In his deposition, the plaintiff stated that he now participates in physical activities such as jogging and playing basketball. (Def. Memo, Plain. Depo., p. 35).

## III.  LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant]

does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

IV. ANALYSIS

A. EXHAUSTION OF ADMINISTRATIVE REMEDIES

The defendants argue that the plaintiff has failed to exhaust his administrative remedies as required for the claims in his complaint. The Prison Litigation Reform Act provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. 42 U.S.C. §1997e(a).

The plaintiff clearly filed a grievance on February 21, 2006 concerning the treatment he received on February 8 and 9, 2006. On March 1, 2006, the grievance was forwarded to the medical unit for a response. The grievance officer then provided a response on June 15, 2006 recommending that the matter be referred to Internal Affairs. On May 5, 2007, the officer filed a final response denying the grievance. (Def. Memo, Group Ex. #1)

The defendants claim the plaintiff did not appeal either one of these responses to the ARB. The plaintiff says he did, but has not provided compelling evidence. It is clear the ARB received something from the plaintiff on July 11, 2006 and the ARB did consider it. A response was not provided until April 9, 2007. The defendants say the plaintiff did not exhaust his administrative remedies before he filed suit on March 1, 2007.

The record is far from clear. While its commendable that the defendants were investigating the plaintiff's claims, the plaintiff still did not receive a final response until more than a year after he filed his initial grievance. The court does not have to decide this matter as the plaintiff has failed to demonstrate that the defendants were deliberately indifferent to a serious medical condition.

B. DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED.

All of the parties have filed motions for summary judgment on this issue. The plaintiff must pass both an objective and a subjective test in order to establish that the defendants violated the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *Wilson v. Seiter,* 501 U.S. 294, 297 (1991). The first prong of the test requires the plaintiff to demonstrate that the alleged deprivation was sufficiently serious. *Id*. The Seventh Circuit has acknowledge that a "serious medical need" is far from "self-defining." *Gutierrez v Peters,* 11 F3d 1364, 1370 (7th Cir. 1997). However, the court noted that the Supreme Court clearly intended to include not only conditions that are life-threatening, but also those in which denial or delay in medical care results in needless pain and suffering. *Id.* On the other hand, "to say that the Eighth Amendment requires prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment would be absurd." *Snipes v Detella,* 95 F. 3d 586, 592 (7th Cir. 1996).

The second prong of the Eighth Amendment test requires the plaintiff to show that the defendants acted with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). "[A] finding of deliberate indifference requires evidence that the official was aware of the risk and consciously disregarded it nonetheless." *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997)(citing *Farmer* at 840-42) Inadequate medical treatment due to negligence or even gross negligence does not support an Eighth Amendment violation. *Shockley v Jones*, 823 F.3d 1068, 1072 (7th Cir. 1987). In addition, inmates are not entitled to a specific type of treatment, or even the best care, only reasonable measures to prevent a substantial risk of serious harm. *Forbes v. Edgar,* 112 F.3d, 262, 267 (7th Cir. 1997).

"[P]roof of deliberate indifference may be found where a prison official intentionally denies or delays access to medical care or intentionally interferes with the treatment once prescribed." *Jones v. Natesha* ,151 F.Supp.2d 938, 945 (N.D. Ill. 2001) *citing Ford,* 2001 WL 456427 at 6. However, "an inmate who complains that delay in medical treatment rose to constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston v Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996).

The plaintiff alleges that he is entitled to summary judgement against Dr. Kurian because of the delay he experienced in receiving medical care and because Dr. Kurian did not personally examine or even talk to the plaintiff. The plaintiff alleges that the doctor was in a rush to get home. Therefore, the doctor simply asked the nurse about him and them ordered a breathing treatment. The plaintiff says the nurse did not take his vital signs, nor did she perform any of the tests claimed. The plaintiff says all the nurse did was give him a breathing treatment and check his peak flow results afterwards. The plaintiff does not explain why his vital signs and the other information is listed in his medical chart. The plaintiff claims the treatment was clearly "inadequate" because his breathing problems returned. (Plain Memo, p. 24)

Dr. Kurian argues that there is no evidence he was deliberately indifferent to the plaintiff. The doctor knew the plaintiff suffered from asthma and provided both a QVAR inhaler and an Albuterol inhaler. The doctor conferred with the nurse and ordered treatment for the plaintiff. The medical record shows the plaintiff was treated by the nurse and he did improve.

The plaintiff does not have a constitutional right to be seen by a doctor, nor does he have a constitutional right to any specific treatment. The doctor and nurse came to the conclusion that the plaintiff was suffering due to his asthma and provided treatment accordingly. Even if this diagnosis was incorrect or the treatment was improper, it does not rise to the level of an Eighth Amendment claim. *Snipes,* 95 F.3d at 590; *see also Gutierrez,* 111 F.3d at 1374. ("[M]edical malpractice in the form of an incorrect diagnosis or improper treatment does not state an Eighth Amendment claim.")

The plaintiff also claims he is entitled to summary judgment against all of the defendants because of the delay in receiving medical care. The plaintiff says because his treatment was delayed on both February 8, 2006 and February 9, 2006, he suffered a severe asthma attack on February 9, 2006 and he has suffered from long term problems as a result.

There is simply no evidence in the record to support the plaintiff's claims. First, the plaintiff was seen by several people on both days including lay people and medical personnel, defendants and non-defendants, and even by the plaintiff's account no one ever indicated that they thought the plaintiff's objective medical condition amounted to a serious asthma attack. *See also Henderson v. Sheaham,* 196 F.3d 839, 846 (7th Cir. 1999) (breathing problems, chest pains, dizziness, sinus problems, headaches are "not sufficiently serious to be constitutionally actionable."). Second, the delay on the first day was less than four hours and the delay on the second day was approximately one hour. Third, the plaintiff himself rated his condition on February 8, 2006, even at its very worst as no more than a 5 or 6 on a ten point scale. Fourth, there is no evidence that Dr. Kurian was responsible for any delay in treatment and Lieutenant Shaw also called for a medical technician. Fifth, there is no medical evidence before the court that the plaintiff was ever diagnosed with a several asthma attack. Dr. Larson determined on February 9, 2006, that the plaintiff was suffering from an upper respiratory infection which was exacerbating his chronic asthma. Finally, there is no medical evidence that the events of February 8 and 9 of 2006 had any long lasting impact on the plaintiff. The defendants motions for summary judgement are granted. The plaintiff's motions for summary judgement are denied.

**ITS IS THEREFORE ORDERED that:**

**1) The plaintiff's motions for summary judgement are denied. [d/e 42, 43].
The defendants' motions for summary judgement are granted pursuant to Fed. R. Civ. P. 56. [d/e 46, 52]   The clerk of the court is directed to enter judgment in favor of the defendants in accordance with this order. The parties are to bear their own costs. This case is terminated.**

**2) The plaintiff's motion for a hearing on the summary judgement motions is denied. [d/e 60]**

**3) If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion**

**for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a strike under 28 U.S.C. 1915(g).**

**4) The agency having custody of the plaintiff is directed to remit the docketing fee of $350.00 from the plaintiff's prison trust fund account if such funds are available. If the plaintiff does not have $350.00 in his trust fund account, the agency must send 20 percent of the current balance, or the average balance during the past six months, whichever amount is higher; thereafter, the agency shall begin forwarding monthly payments from the plaintiff's trust fund account to the clerk of court each time the plaintiff's account exceeds $10.00 until the statutory fee of $350.00 is paid in its entirety. The filing fee collected shall not exceed the statutory filing fee of $350.00.**

**5) The plaintiff must notify the clerk of the court of a change of address and phone number within seven days of such a change. Release from incarceration does not relieve the plaintiff of his obligation to pay the filing fee in full.**

**6) The clerk is directed to mail a copy of this order to the plaintiff's place of confinement, to the attention of the Trust Fund Office.**

Entered this 22nd day of September, 2008.

s\Harold A. Baker
_____
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE